## DECEMBER TERM, 1843.

### P. B. POPE *v.* THOMAS ANDREWS, *et al.*

A sale, by one greatly in debt, and whose every means were more than demanded to meet his immediate pressing wants, of his property on a credit of nine, ten, and eleven years, is made " *with intention to hinder, delay, and defraud creditors.*"

If a vendor make a fraudulent sale of his property to avoid the payment of his debts, to a vendee, ignorant of the fraud of the vendor, the vendee will be protected, as a purchaser for valuable consideration.

Fraud *may be inferred* from facts and circumstances, such as the nature of the contract and the relation and circumstances of the parties.

A vendee of land held to be privy to the fraud of the vendor ; 1. Because he was the brother of the vendor, and lived in the same neighborhood, and sometimes together ; 2. Because the vendor at the time of sale was embarrassed by debts, and that embarrassment known to the vendee, and the vendor had declared his intention not to pay the debts embarrassing him, which declaration, from their relation, the vendee was presumed to have known ; 3. Because the sale was made upon a credit of eleven years, and the vendee knew the effect would be to divest the vendor of all his property, and thereby hinder, delay, and defraud creditors in the collection of their debts.

A defendant charged with colluding with his co-defendant, in regard to the transaction sought to be impeached, cannot be a witness for his co-defendant, *especially*, where he is liable for costs.

A vendor of land, who has taken a deed of trust to secure to himself the purchase-money, is not a competent witness for the vendee, when the sale is attacked as fraudulent, to prove its fairness, or testify in relation to it, he being directly interested in upholding the sale, in order to enforce payment of the notes secured by the deed of trust.

THE bill states, that, at the May term, 1839, of the Yazoo circuit court, Hayden, for the use of Pope, recovered a judgment against Vance and Joseph Andrews, for $3,832·55. Execution issued on this judgment, and in January, 1840, was levied upon certain land, in all, 2,074,51 acres, as the property of Joseph Andrews, which land, by virtue of this levy, and others of a younger date, was sold after legal advertisement, to complainant, for $2,902·79, who received from the sheriff a deed therefor. That Joseph Andrews, by deed, dated 4th March, 1839, conveyed the *same* land to Thomas Andrews, his brother, who is by trade a carpenter ; was worth nothing when he came to Yazoo county, where he had lived two or three years, and that, after date of his sale, he continued to work at his trade ; that the convey-

Pope *v.* Andrews, et al.

ance from Joseph to Thomas Andrews is fraudulent ; that all the property of " every character and description whatever, which Joseph Andrews owned," is conveyed by that deed ; that since the conveyance, Thomas Andrews had exercised but little control over the property, certainly not so much as Joseph Andrews, who remains on the place, superintends, directs, signs receipts as *agent* for his brother, strips the cotton, &c. Thomas Andrews made a deed of trust to Washington Dorsey, and others, to secure the purchase-money, agreed to be paid by him to Joseph Andrews, for the property sold, as aforesaid ; which notes were payable as follows, to wit : $3000 payable at two years after date, and three notes for $20,684·66, payable at nine, ten, and eleven years after date each, and all dated 4th March, 1839 : that Thomas Andrews was worth nothing when he came to Yazoo county, and has accumulated nothing since ; and though a respectable workman, was the last man to whom the most visionary speculator would have thought of selling a large property. on long credit : that at the time of this sale, Joseph Andrews was largely indebted, in fact owed more than he was worth, by $20,000. The debt in favor of Hayden had been long due, and was put in suit soon after the sale, to wit, on the 15th March, 1839 : that no consideration ever passed, or is ever to pass, from Thomas to Joseph Andrews, and that Thomas holds the property for the purpose of defrauding the creditors of Joseph Andrews, the sale to him having been made with that intent.

The answer of Joseph Andrews admits the rendition of the judgment, and the purchase by. Pope, at sheriff's sale, as stated in the bill ; also the sale of the land from him to Thomas Andrews, and the execution of the deed, and deed of trust, as stated in the bill ; admits, that about the time complainant's judgment was rendered, other judgments to about $6000, or $7000, were rendered against him ; denies, that when he sold to his brother, he was in debt $20,000 more than he was able to pay, and says he owed but little compared with his worth ; and believed then, and now believes, he can pay all he owes in the world, without applying to it any part of the purchase-money of the property he sold his brother ; denies that the sale to his brother was fraudulent, or

made with intent to hinder, delay, or defraud his creditors, or that he is the owner of the property, or has any other interest in it, than the deed, and deed of trust, import ; but that the property is the rightful property of his brother, the sale having been fairly made to him. When he sold to his brother, he was in feeble health, and had been advised by his physician to leave the State, in order to its restoration. That he was a single man, his brother a married man, and he was willing to sell him a good bargain, if he could ; that the price his brother agreed to pay was as much as the property was worth, or as any other person would have agreed to give. The land sold was uncleared woodland. That of the slaves, only seventeen or eighteen were working hands ; the balance being children, some at the breast ; says it is true, his brother is a carpenter, as is Joseph Andrews ; but denies that his brother was worth nothing, but says he was worth $10,000, or $12,000 ; denies that he exercises ownership or control over the property ; admits he occasionally resides with his brother, and says, he on one occasion signed a receipt in the name of his brother, and procured an advance to be made on his cotton, and refers to his brother's answer, to explain this transaction.

The answer of Thomas Andrews admits the rendition of the judgment in favor of complainant, and the sale by the sheriff to him, as stated in the *bill* ; admits the insolvency of Vance ; also the execution of the deed by Joseph Andrews, and the deed of trust by himself to Dorsey and Regan ; admits that judgments for $6000 or $7000 were obtained against Joseph Andrews at the same term complainant's judgment was rendered ; but denies that his brother was then indebted $20,000 more than he could pay ; but he then thought, and still thinks, his brother was able to pay all he owed, and have left, a handsome estate ; admits he is a carpenter by trade, and worked at it when he bought of his brother ; denies that he was then worth nothing ; says he was worth $10,000 or $12,000 ; denies that the sale was made to him in bad faith, or with a view to hinder, delay, or defraud the creditors of his brother, but says it was made in good faith ; that his brother was in ill health, and had been advised by his physician to leave the State ; his brother was a single man, and had no family ; he was

married ; that he agreed to pay a full price for the land, and slaves, giving more than $10 an acre, for woodland, and an average of $1000 for slaves, and in like proportion for other property ; denies that Joseph Andrews is the owner of the property, or that he has any other claim to it, or lien on it, than is given by the deed of trust ; admits that Joseph Andrews lives with him, occasionally, but denies that he exercises any ownership or control over said property ; admits that at one time he signed a receipt, as his agent.    The circumstances were as follows : Respondent had agreed to advance Joseph Andrews some money out of the crop of 1836, and he gave Joseph Andrews authority to procure an advance upon that crop, and to sign his name to a receipt, he being absent from the country.    Joseph Andrews got the money of complainant, and gave him the receipt ; states that his brother is able and willing to pay all his debts, and that the sale was made to him in good faith, and for the consideration expressed in the deed, and deed of trust ; that it was absolute and unconditional, and without any reservation to his brother, in secret, or otherwise, other than appears on the deed, and deed of trust.

The proof in the case was as follows :

1. Hiram Harrison, witness for complainant, states that in the spring of 1836, he travelled up the river with Thomas Andrews, who informed him, that the winter before he had made, and had then with him, $500 or $600.    He also got some exchange on New York at Vicksburg, but what amount he does not know.

Washington Dorsey, also for complainant, says, that he was a party to the deed of trust in controversy, and had no reason to believe that the conveyance was made to defraud the creditors of Joseph Andrews.    He was the physician of Joseph Andrews, and advised him, from year to year, to sell out his plantation and leave this country, as his health was very bad ; Andrews replied he would not leave unless he could sell his property.    He afterwards informed Dorsey that he had sold the plantation, on which he resided, to Regan ; afterwards he said he had sold his other property to his brother Thomas ; shortly after the sale to Regan, he said the proceeds of his crop of 1839, and that sale, would place him free from debt, and leave him a surplus.

Stephen G. Mathews, another witness for complainant, knows nothing of either of the deeds, except from rumor ; knows that Joseph Andrews was a carpenter, of the firm of Vance & Andrews, that Vance acted very imprudently in using the firm name to a large amount, as drawers and indorsers ; the witness indorsed a note for $2700, drawn by Vance & Andrews, and thought when he heard of the conveyances, that they were made to protect Joseph Andrews against the imprudent conduct of Vance, and that he was still of that impression; that Joseph Andrews told him the copartnership of Vance & Andrews was limited, and that he was *not* liable for any of Vance's indorsements. The note which witness indorsed has been paid.

Jefferson J. Hughes, a witness for complainant, knows that Joseph Andrews was largely indebted to the Commercial Bank of Manchester, on the 4th of March, 1839, as principal and surety, but cannot say how much of this liability was of Joseph Andrews, individually, nor how much on account of Vance & Andrews. He also holds a note of Andrews (Joseph) for about $3200, in favor of Hayden, and thinks, from facts developed since 4th March, 1839, that the solvency of Joseph Andrews was then doubtful.

A. G. Harrison, a witness for same ; upon examining the clerk's office, finds that Joseph Andrews was sued on and before the 4th of March, 1839, for about $22,500 ; and on examining the execution-docket of the sheriff, at May term, 1840, finds an execution for $2800, against Joseph Andrews and others, returned " no property found."

The deposition of the defendant, Joseph Andrews, a witness for defendant, Thomas Andrews, was taken under an order of Court, subject to all exceptions as to competency. Before giving his deposition, he filed a release from Thomas Andrews, of the covenants of warranty, in the deed of the latter to him in case the title to the land should prove defective; he states, that for several years his physician had advised him, from time to time, to arrange his business, and leave the State, in order to restore his health ; that, for several years before the sale to his brother, he had made efforts to sell his lands, and part of his field negroes, in order

that he might leave the State, and travel for the restoration of his health, having had a severe spell of sickness every year, for four preceding years. In the winter previous to the sale to his brother, he had an attack which nearly deprived him of life, and weakened his mind in proportion, from inflammation of the brain, and his physician told him he was unable to attend to the drudgery of a plantation. He owed the Commercial Bank of Manchester $8000 or $9000, and a small debt to the heirs of Howell Runnels. The notes in bank were not due; part of the debt to the heirs of Runnels was due. He believed, from the proceeds of his crops, he could have paid all his debts, without any trouble, if he could have attended to business himself. His partner, Mr. Vance, having failed to pay some debts of the witness, as he had agreed, witness concluded he might fail to meet some of the notes in bank when due, and that, consequently, a heavier indebtedness would fall on him than he could meet by the proceeds of his crops, without his personal supervision, and which he was unable to give; witness therefore agreed to sell his improved plantation to Mr. Regan, who agreed to give $22,000 in one, two, and three years; Regan was punctual and prompt in his dealings, and witness did not doubt but he could meet the payments very easily. He belived that Regan's two last payments would pay all his individual debts, not due, and that the proceeds of his previous years' crop, and his bank stock, would pay all he owed then due, and leave him a small cash balance, while he would have $7000, Regan's first payment, falling due in eight or nine months. His brother also owed him $4000, falling due in about the same time, for other property sold him, and not included in the deed of trust. The two last-named sums were believed by him to be sufficient to take up all the liabilities he was under, originally, for the firm of Vance & Andrews, and which were about $10,000. The book-keeper of the firm of Vance & Andrews, had, a short time before, made out a statement for him, showing ample means to pay all the debts of the firm, so far as they appeared on the books, if one half only could be collected in a reasonable time. Sometime after the sale to his brother, he went to Manchester, to settle with Tucker, the agent of Runnels' heirs, and arranged to pay him with his bank

stock. Mr. Hamer, the president of the bank, however, refused to transfer it, saying Vance had overdrawn for $3000, and he would not pay over to witness any balances, or transfer his stock, till that was paid, which overcheck Vance had procured by false statements, &c. This was the first time he had any doubt of the correctness of Vance's conduct; witness then determined to secure all the debts which he owed with undoubted papers, which he believed would be paid in eight or ten months, and he accordingly did secure the whole of Vance's delinquencies, amounting to $14,000 or $18,000, with such papers, including that of Mr. Regan; although Vance assured him he would meet all the firm debts, and that he had sufficient means to do so, without any injury, of much consequence, to witness; witness had no design of fraud upon any creditor, but made the sales in order to enable him to pay all his debts, and to prevent the possibility of loss to his creditors, which witness then believed to be his duty, both to them and himself. The property sold to his brother, he never expected to have occasion to use in payment of his debts; in fact, as his health was so feeble, he did not expect much to have any use for it, and thought it most probable his brother would only have to settle with the other brothers, and heirs of witness. The land sold to his brother, though of a good quality, was a dense forest, entirely unimproved, and could not be made productive, to any extent, in less than four or five years, with much labor and expense. The price he obtained, was as much as others, in whom he could confide to pay, and not treat the slaves cruelly, would have given. He believed, at the time he sold to his brother, that he had ample means to meet every debt he owed in the world. The land was worth $12 or $15 an acre, in cash: he rated it to his brother at $20, and the slaves at an average of $1000, big and little, which witness believed a full and fair price for the property; witness gave so extended a time for payment, to enable his brother to clear the land, and make the payments out of the proceeds; so far from intending to defraud his creditors, witness then believed that he had made ample arrangements to pay all his debts; witness has paid every execution against him, except one in favor of Commercial Bank of Manchester, for the use of

Moore, which was rendered on process served, while witness was out of the State, which witness has enjoined, and which he has been advised by his counsel he is not bound to pay, as the note is signed in the name of the firm, as surety for another ; though witness is able to pay this note, if he should ultimately have to do so: witness always believed himself able to pay, and intended to pay complainant's judgment, and made an arrangement with complainant, as he understood, to do so : but complainant concluded not to abide the agreement, and to sell the lands. His brother took possession of the land ; has cleared about 150 acres of it, and has put $6000 or $7000 worth of improvements upon it ; the charge in the bill, that the sale to his brother was made to cheat, hinder, and delay payment of his debts, is not true ; Mr. Vance attended to the business of the firm of Vance & Andrews ; witness knew nothing about it, or its details ; McElhenny was clerk of the firm, and book-keeper, during the whole of its existence. He showed witness, about a month before the sale to his brother, a statement of the debts and liabilities of the firm of Vance & Andrews, and of the assets of the firm, and showed a balance of assets of more than $33,000 : witness being cross-examined, said he never did say, to the best of his recollection, that he would not pay the firm debts, or that the sale to his brother was made to gain time.

R. M. McElhenny, a witness for defendant, states that he was book-keeper for Vance & Andrews, from the 10th of October, 1837, till 1st January, 1839 ; and that he gave Joseph Andrews a statement of the assets and debts of the firm, as shown on the books. The books only showed such debts as were created for the benefit of the firm. The assets of the firm, at their then nominal value, exceeded its debts ; how much, witness did not recollect : the firm of Vance & Andrews was liable as indorser, on paper which the books did not show; and does not believe the assets yielded a third of their nominal value. The stock of goods and real estate were sold by the sheriff at a sacrifice, and many debts, then considered good, have since proved worthless.

Richard Abbey, a witness for defendant, thinks $20 or $30 per acre for the river land, and $10 per acre for the hill land, a fair

price, on the terms Joseph sold to Thomas Andrews ; and three of the negro fellows he had noticed, would have sold, on the same terms, at $1200 or $1400 each. The land sold could not be put in cultivation, as lands usually are, in less than six or seven years—though it might be cleared, so as to be cultivated, the first year ; and it is worth $25 or $30 an acre to clear such land properly.

F. W. Wheeliss, also for defendant, says he was deputy sheriff in Yazoo county, in 1839, and part of 1840, and collected upwards of $500, that he recollects of, on executions in favor of Vance & Andrews ; there were sundry executions in their favor, but to what amount does not know. Joseph Andrews had control of those executions, and directed the money collected on them to be paid to complainant, who agreed, in the presence of witness, to receive such sums on the execution in his favor.

Charles F. Hamer, for defendants, states that in the fall of 1839, Vance & Andrews transferred to him all the assets of the firm, to collect ; and shortly afterwards directed him, in writing, to pay to Pope all moneys he might collect, until the judgment in favor of Pope was satisfied. Joseph Andrews told witness, the object, in making the transfer to Pope, was to gain time, and to make the assets of the firm pay the debts of the firm ; and that Pope had agreed to give him time, if he would give him such a power ; and witness, in pursuance of these directions, paid Pope from time to time, about $500, and continued to pay him as he collected money, until he heard of the sale of the land in controversy. On cross-examination, he states that he always thought, from his knowledge of Joseph Andrews's circumstances, that he owed little or nothing on his own account, at the time alluded to. Witness had seen many notes signed by Vance & Andrews as first drawer and surety, amounting, it may be, to $20,000. Witness was plaintiff's attorney in several suits brought on these notes. Mr. Andrews defended the suits ; pleaded non-assumpsit under oath. Witness introduced proof of the existence of the partnership, but the jury found for Andrews in all the cases tried. Some of the cases were continued, and are still untried. In one case, witness got a verdict ; in it there was no plea ; Mr. Andrews obtained an injunction to that

judgment : Mr. Andrews's means are not now available, as witness understands, his property having been sold on a credit. If his property had been sold for cash, and his debts had been as large as his *apparent liability*, his property would probably have not paid them.  About the 1st of October, 1839, Joseph Andrews had a conversation with witness, in reference to the indorsements of Vance & Andrews.  He seemed to dislike being sued upon them, very much ; said he thought Mr. Vance had no right to sign his name on any account ; he had always considered the partnership a limited one ; that he was quite sure he was not bound, in law or equity, to pay them ; and would not do so, unless compelled by law.  " Witness is not sure, but thinks at one time he understood Mr. Andrews to say, he never would allow his individual means to go to the payment of the debts created by Vance in the name of the firm ; generally he said he would not pay them unless compelled by law; and witness is not quite sure that he did not always use that qualifying expression" ; that Andrews told him, if the debts of the firm were collected, it would pay all debts, which was all he wished, as he did not desire to take anything from it ; that he was willing to pay the notes originally given in the name of the firm for goods, although Vance had collected the money of the firm, and had agreed to pay these notes ; that he was willing to pay all just claims, but that Vance had used the firm name for gambling, and other purposes, because he knew Andrews was in good credit.

Richard C. Hyatt proved that Joseph Andrews had paid about $7000, under execution, to the Planters' Bank, on account of the debts of Vance & Andrews, part in Union Bank paper, at par, and part in the notes of others ; that the reason the paper of the Union Bank, and other notes, was taken, was, that the bank had understood that Joseph Andrews had sold out his property, and was returned " *nulla bona*" upon execution, and that if the bank got its money at all, it would be after long delay.

John M. Anderson proves that he knew Thomas Andrews in Mississippi, in 1832 ; he knew him in 1839, and thinks the property he owned in Yazoo county, was then worth, as property was selling, about $25,000 ; but that it had since greatly declined in value ; what his debts were, he did not know.

Joseph Regan thinks the property of Joseph Andrews, in the spring of 1839, at a cash valuation, was worth $40,000, at least ; and that he was perfectly able to ,pay all his debts.   In the spring of 1839, he bought about 720 acres of land of Joseph Andrews, for which he was to pay him $22,000, in three equal annual payments.    Joseph Andrews also owned, at that time, two sections of land in Louisiana, which he sold to a Mr. Robinson.

M. B. Hamer states, that in the spring of 1839, Joseph Andrews deposited a note for about $7000, drawn by Joseph Regan, and others, as collateral security for a note of about $5500, held by the Commercial Bank, at Manchester ; which note has been paid. Andrews also owed said Bank another note, for about $4000; and the note of Regan, so deposited, was intended as collateral security for it also ; he has deposited as collateral to the last note, another note for about $3000.    Andrews also paid two other notes, for about $3000 each, one due two years after 31st January, 1837; the other payable eighteen months after date, but date not recollected.    On cross-examination, he states he knew Joseph Andrews was considerably involved by Vance ; heard him say, in the spring of 1839, that Vance had ruined him, which of course impaired his credit, which he would not have deemed sufficient for any considerable amount ; does not know what time may prove about his solvency or insolvency; knows he has been sued for large sums, as a partner of Vance & Andrews, from a portion of which he had been released—though what amount, witness does not know; had heard Mr. Andrews say that he would not pay the debts of Vance & Andrews ; that Vance had swindled him.

Henry Hagan proves that the land sold to Thomas Andrews, by his brother, was worth, at the time of sale, about $27,000; that in the year 1838, he had heard Joseph Andrews express his intention to sell his lands in Mississippi, and move west of the Mississippi river, on account of his bad health ; that Mr. Joseph Andrews's property in Yazoo, other than that sold to his brother, was, in March, 1839, worth upwards of $22,000 ; that at the time of the taking his deposition, November 18, 1840, Joseph Andrews owned no visible property in Yazoo county; that his estimate of Andrews's property was formed from his views of its intrinsic value ; that he had

not known any land sold since that period, *at one half* the price he had put upon the land.

*S. S. Prentiss*, for complainants.

By the testimony given in the case, it appears, that at the time of the sale from Joseph to Thomas, Joseph was deeply involved ; *nearly* $50,000, of pending liabilities are designated by the witnesses. In all probability, much more existed unknown to them.

The law presumes a man to *be aware* of his debts and obligations — and it is therefore a legal presumption, that Joseph Andrews knew of his ; as they have been proved by the witnesses. There is no necessity of bringing home by express proof, to a debtor, the knowledge of the liabilities he has himself contracted.

Even if such necessity existed, it is shown that he knew of them in the spring of 1839, by his complaints to M. B. Hamer, that Vance had ruined him.

In the spring of 1839, just before the sale to his brother, J. Andrews had sold to Regan all the rest of his property, except that embraced in the deed to Thomas, for $22,000, on one, two, and three years' credit.

What, then, was his intention, when he sold to his brother ? Involved in liabilities to the amount of nearly $50,000, he sells, on a credit of eleven years, all his visible, tangible property, that could be reached by creditors, retaining nothing whatever that was accessible : neither of the Regan notes due, and nothing to which his creditors could turn for the liquidation of their just claims.

Take these facts in connection with the fact, that the goods of the firm of Vance & Andrews had already (on 1st January, 1839) been seised in execution by the sheriff, and that Andrews was complaining, that Vance had ruined him ; and who can doubt, that the sale to his brother was intended, by him, at least, to delay his creditors ?

That the conveyance of J. Andrews to Thomas embraced all his tangible property in his possession, is proved,

1st. By the return of "*nulla bona*," immediately thereafter, as stated by "Hyatt," in his deposition, on the execution of the Planters' Bank, and in another case, as stated by A. G. Harrison, in his deposition.

2dly. By the evidence of *Dorsey*, who states, that, after selling to Regan, he sold out *his other property* to his brother Thomas. Also, by Regan's testimony, who speaks of his property left, as consisting of perhaps ten acres of land, and a lot belonging to Vance & Andrews.

Now, to establish fraud in Thomas, or rather a knowledge of it in Joseph, it is necessary to look at his situation, and to all the circumstances of the case.

Fraud can seldom be proved positively ; it is to be judged from its badges.

The evidence shows that Thomas had been living with his brother for seven or eight years. Is it not natural to presume he knew as much of his brother's situation as strangers ? — of his business — of his liabilities — of the extent of his property ? As to the assets of the partnership of Vance & Andrews, there is no proof that they ever yielded more than the paltry $500, paid over by C. F. Hamer to Pope. Both defendants acknowledge, in their answers, the utter insolvency of the firm.

Thomas Andrews admits, in his answer, his knowledge of judgments to a considerable amount against his brother, at the time of the conveyance.

The pretences set up for the sale, by both defendants, clearly indicate *fraudulent intent* in the transaction.

The pretence of sale is, that Joseph was in ill health ; expected soon to die, and wished to move to another country.

Would a man, expecting soon to die, sell all his property on ten or eleven years' credit ? Would a man, going to another country, sell all his possessions on such credit, and deprive himself of the means of travel, or subsistence ? Besides, what was the fact ? J. Andrews, with the exception of two or three months, has been residing all the time with his brother, on the place.

But the *great and conclusive evidence of fraud*, is in the *terms* of the sale, the *enormous credit*, and the provision that the deed of trust shall not take effect till the last note falls due ; a period of eleven years. *This time shocks common sense ; is unusual, unnatural*, and *fraudulent, per se*, upon its face, as to creditors.

The rule upon this subject is not fixed, but depends upon the

circumstances of each case ; but in this case, it seems to me there can be no doubt. The very offer to sell, on such credit, should have put the vendee on his guard. It is, of *itself*, *notice* of fraud.

That *long time* may be *per se* proof of fraud, *vide* 7 Greenl. 241 ; see also 2 John. C. R. 297 – 304, ib. 43, ib. 48.

If defendant had other property than that embraced in the deed, *he is bound to prove it.* 14 John. 499.

Defendant, Joseph's, deposition cannot be read for two reasons :

1st. He has proceeded to take testimony to sustain the very points to which he deposes ; this cannot be done. 2 Ves. sen. 223.

2d. Because he is charged with fraud, and is interested in the question of costs ; and also in the notes given for the consideration, which could not be recovered, if the sale is set aside in this suit ; for the maker could set up a total failure of consideration. 2 Ves. 628, 629 ; 3 John. C. R. 371 — 613.

I will here mention, as a proof of fraud on the part of Thomas Andrews, the release he has given of all the covenants of the deed. Had the purchaser been *bonâ fide*, he would not, as a sensible man, have given such a release.

Joseph Andrews is directly interested in sustaining the deed, for upon the deed of trust he depends for security of the notes given. If the deed is set aside, the deed of trust falls with it, and he loses his security ; he is therefore directly interested in sustaining the deed.

*Wilkinson* and *Miles*, on the same side.

This being a cause of considerable importance, both as it respects the amount of property involved, and the application of legal principles to the facts, as developed by the pleadings and proof, we deem it proper to draw the attention of the Court to the several points most prominently presented.

1st. A judgment creditor has the unquestionable right to levy his execution upon land fraudulently conveyed by his debtor, and, if it becomes necessary for self-protection, to purchase it. As a necessary corollary, it follows, that the purchaser may file his bill in this Court, to have the fraudulent deed of the debtor set aside. Upon the ground, *first*, that fraud vitiates the contract *in toto* ;

*secondly*, that courts of equity entertain jurisdiction to remove clouds from land titles.   Dick. Rep. 84; ib. 761 ; Shep. Touch. 66, 67 ; 1 John. Cha. Rep. 481, 482 ; 14 John. Rep. 498.

2d.  Notwithstanding the maxim, " fraud will never be presumed," it is now too well settled to be questioned, that fraud *will be presumed*, if the facts of the case justify it ; although the defendants positively deny, by their answers, any intention to defraud, hinder, or delay creditors.   1 John. Cha. Rep. 481 – 487 ; 2 John. Cha. Rep. 297 – 304 ; ib. 43 – 48 ; 18 John. Rep. 426 ; 1 Day's Conn. Rep. 295.

3d.  Supposing fraud fixed upon Joseph Andrews, the vendor, and not upon Thomas Andrews, the vendee ; what effect will the deed of conveyance have against the claims of the complainant, as a judgment creditor of the vendor ?   After a careful investigation of the books on this subject, we find it laid down by numerous cases, decided by the brightest ornaments of the English and American Bench, that such a conveyance as this, made and executed under such suspicious circumstances, will not be permitted to stand against the creditors of the vendor.   And the deed will be cancelled, though the vendee be a *bonâ fide* purchaser without notice. 14 Ves. 289, 290; 2 Ves. sen. 627 ; 1 Dow, 30 ; Shep. Touch. 66, 67 ; 2 John. Cha. Rep. 42 ; 1 Conn. Rep. 527, notes ; 7 Cow. 301 ; 7 John Cha. Rep. 64 ; 1 Cow. Rep. 632 ; 7 Greenl. Rep. 241.

4th.  Was not the land subject to seizure and sale under execution, by virtue of the provisions of our statute, making estates of every kind holden or possessed in trust, subject to like debts and charges of the person to *whose use* they shall respectively be holden, as they would have been subject to, if those persons had owned the like interest in the things thus holden or possessed, as they own in the uses or trust thereof ?   H. & H. Dig. 349, § 29.

We will not fatigue the Court by a discussion of the first point made.   It is too familiar ; and the reasons by which it is sustained are too firmly settled to require illustration or argument.   Passing on, we next approach the second point, which, seemingly, is the most formidable in the cause.   Now, although the defendants are called on to answer, as to their motives in making this conveyance, and, in

response to the bill, have denied all fraud ; it is insisted, that if the facts in the cause prove a fraudulent intent, the Court will adjudge the deed fraudulent, the answers of the defendants to the contrary notwithstanding. For if the *mere denial* of fraud by defendants, is to outweigh facts and circumstances which fasten upon the transaction the marks of covin, deceit, and trick, from which a violent presumption of fraud may legitimately arise, the temptations held out for perjury will be so great, as to deter creditors from seeking redress of their grievances. Without imputing such conduct to the defendants in the present cause, we lay it down as a general rule (subject to few qualifications), that a man, who will swindle or defraud his creditor, will lie, to conceal it ; and, if called upon by bill to disclose matters which would derogate from his standing in the community, and show him off in his true light to the world, to preserve consistency of character, he will seldom fail to add crime to crime, by swearing to the *bonâ fides* of a transaction which he knows to be clothed with the full dress of unrighteous intrigue.

Fraud will be presumed, if the facts and circumstances of the particular case justify it, in the face of a full and peremptory denial by the answer. It is to be gleaned from *all* the facts and circumstances appertaining to the case under consideration: the *situation* of the vendor and vendee ; the *relation* they occupy towards each other ; the *value* of the property conveyed, and the *price* given, or agreed to be given, for it ; the *mode* and *time* of payment stipulated for ; the *declarations* of the vendor prior to the conveyance, must all be taken together in the estimate ; and if, separately or collectively, they furnish strong and controlling evidence of a fraudulent intent, the Court will so declare it. See cases cited under second head. The bill, answer, and proof show that Joseph Andrews, the *vendor*, was *largely* indebted, at the time this conveyance was made. That it was executed on the eve of the recovery of a large amount of judgments against the vendor ; and that Thomas Andrews, the *vendee*, was not in a condition to justify him in making the purchase at that *peculiar time*. A time when an unparalleled pecuniary embarrassment prevailed ; when a man of princely fortune would scarcely have ventured on such a purchase as did the defendant, Thomas

, Andrews, almost void of means.   The defendants are *brothers* ;
which, connected with the other facts in the cause, and the univer-
sal suspicion thrown by the books over transactions of doubtful
honesty, between persons so nearly related, furnishes almost con-
clusive evidence of a fraudulent intent, on the part of both defend-
ants.

The *time* of payment stipulated for, furnishes irrefragable evi-
dence of direct fraud, on the part of both defendants.   In a cause
involving similar facts, where the vendor and vendee were not so in-
timately related as here, Chancellor Kent adjudged the conveyance
fraudulent.   2 John. Cha. Rep. 297 – 304.   It will be recollected
that in this case, a credit of about *ten* years is given by the vendor
to the *vendee*, and that little or none of the purchase-money has
been paid.   2 John. Cha. Rep. 44 ; ib. 297 ; 11 Wend. Rep.
191 – 203, 217 ; 4 Mason, 225 ; 1 J. J. Marsh. 226.

The declarations of Joseph Andrews, the *vendor, prior* to the
conveyance, prove that his direct intention was to defraud com-
plainant.   It is in proof, by two of their own witnesses, M. B. and
C. F. Hamer, that Joseph Andrews had frequently declared, " he
never would pay the debts of Vance & Andrews."   The bill
shows that complainant's claim was *one of that ·class.*   It is also
proved by C. F. Hamer, that Joseph Andrews told him his object,
in making the conveyance, was to "*gain time.*"   R. C. Hyatt
proves (who is one of defendant's witnesses), that he, as Cashier
of the Planters' Bank, was constrained to compromise the claims
held by the Bank against Joseph Andrews, because he had *sold all
his property on a long credit.*   Hughes and Harrison, both prove a
large and heavy indebtedness on the part of Joseph Andrews, at the
*time* he conveyed his property ; and that the sum of $22,506, was
in suit against him, at the time he executed this conveyance.   S.
G. Matthews proves that the conveyance was made to *protect* Jo-
seph Andrews from the imprudence of Vance.

The deposition of Joseph Andrews has been taken under an or-
der of court ; to the reading of which we object.   A party charged
with making a fraudulent deed, is an incompetent witness to prove
the *bonâ fides* of the transaction.   2 Ves. sen. 628, 629; 3 John. Cha.
Rep. 271 ; ib. 613.   The *release* of Joseph, by Thomas Andrews,
from all the *covenants* in his deed, in order to make him a *disinterest-*

*ed* witness, shows off this transaction in its original colors, and furnishes controlling evidence of the intention with which it was entered into.    Should the *title* to the property fail, the vendee will be compelled to pay up all the purchase-money, without any recourse upon the vendor.    2 How. Rep. 601 – 609.    If taking a quit-claim deed implies knowledge of a *doubtful* title, much more would a *release* from all covenants in a deed fix the vendor with such knowledge.

The *trust deed*, executed by *Thomas Andrews* to Dorsey & Re-gan, gives to Joseph Andrews the whole property, as security for the payment of the purchase-money ; which renders Joseph Andrews directly interested in the result of the suit, and his deposition is in-admissible on that ground.    He is *interested* in sustaining the deed, in order to save the *security*.

Now we ask, if it be possible for a court of equity to uphold a transaction like this, marked as it is, at every step, from its com-mencement to its termination, with the *strongest indicia of fraud* ?

If the Court shall doubt whether fraud is fastened upon Thomas Andrews, the *vendee*, we then rely upon the strength of the cases cited under the 3d head.

But we think it is shown, conclusively, that the entire contract, on the part of *both* defendants, was conceived in fraud, and made its appearance in the world covered with the distinguishing drapery of its original sin.    The *vendee* is the brother of the *vendor;* is a man comparatively without means : from the circumstances, must have known of the indebtedness of the *vendor;* and, at a time of such general embarrassment, never would have made such a purchase, unless for the purpose of securing his *brother's* property, in deroga-tion of the rights of his creditors.    4 Raw. Rep. 309.

We next call the Court's attention to a sound and legitimate con-struction of the act of the legislature before referred to, H. & H. Dig. 349, sec. 29.    It is thought, that under the provisions of the act, the land was liable to seizure and sale.

All other positions failing, we then rely upon the case in 1 John. Ch. Rep. 481, as a dernier resort.    Under the rule, as there laid down, the Court will compel *Thomas Andrews* to pay up the amount of Pope's judgment, or, in default, order him to convey the premises to Pope.

*W. Yerger*, for the defendants.

The evidence in the cause, to my mind, proves anything else than fraud, even upon Joseph Andrews : though so far as Thomas Andrews is concerned, there is not the slightest pretence that he was guilty of any fraud, or participated in any design to defraud the creditors of Joseph Andrews, if Joseph, even, had such intention. I need scarcely state the rule of equity, that fraud cannot be presumed or inferred from slight circumstances ; although it is admitted that direct proof of fraud need not be adduced.

It may be proved by circumstances, as well as anything else. But where an act does not necessarily import fraud, where it may have occurred as well from good as bad motives, fraud will not be inferred.  8 Peters, 253.

To vitiate a conveyance as fraudulent, there must be a fraudulent design in the grantor, and notice of that design in the grantee. 4 Rand. 282 ; 4 Wheaton, 466 ; 9 Yerger, 327 ; 8 Peters, R. 253 ; Baldwin's C. C. R. 110 ; 3 John. Ch. R. 378 ; 14 John. R. 498 ; Howard & Hutch. Dig. 370, 371.

In the case before the Court, it would be necessary for the Court to indulge two presumptions, before it could set aside this sale. First : it will have to presume that Joseph Andrews intended a fraud ; and, secondly : that Thomas Andrews, being cognizant of such intention, participated in it, by making the trade.  Upon looking at the facts, I do not think that they are sufficient to raise the first presumption.  I am sure they do not warrant the second.

In order to raise a presumption of fraud, " it is not sufficient that the fact to be inferred often accompanies the fact proven ; it should *most usually accompany* it : and I would say, in the absence of all circumstances, that it should *rarely* otherwise happen."  *Hart* v. *Newland*, 3 Hawks, R. 122 ; *Pattershall* v. *Lurford*, 23 Eng. L. R. 214 ; 2 Phil. Ev. New ed. 289, et seq.; 1 Phil. Ev. New ed. 504.

After every effort to establish fraud, if it remains doubtful upon the proof, innocence is to be presumed.  2 Phil. Ev. New ed. 298 ; 1 Rep. Const. Ct. 308, 309 ; 1 Wash. 306, 308 ; 3 Cases Ch. 85, 114.

It is objected, that Joseph Andrews is not a competent witness

for Thomas Andrews. His interest is clearly against Thomas Andrews, and in favor of the complainant; and the fact that he is charged as a *particeps fraudis* does not exclude him.   6 John. R. 135; 1 Rawle, 141; 9 Pick. 139, ib. 176; 11 Mass. R. 498; 2 Phil. Ev. new ed. 70, ib. 120; 4 J. J. Marsh. 86; 7 Wend. 229; 2 Gill & John. 132.

By the CHANCELLOR.   This bill is filed for the purpose of setting aside a deed from Joseph Andrews to his brother, Thomas Andrews, of certain lands in the county of Yazoo, dated the 4th March, 1839. The complainant claims those lands as a purchaser, under a judgment rendered in his own favor, in May, 1839, against *Joseph* Andrews and James H. Vance; and alleges that the deed from Joseph to Thomas Andrews, was made to " delay, hinder, and defraud" his creditors ; and prays that the same, as to him, may be declared fraudulent and void.   The answers deny all fraud, and insist that the sale to Thomas Andrews was made in good faith, and for a valuable consideration. I am to decide upon the issue thus made : 1. Whether there was fraud on the part of Joseph Andrews : and, 2. Whether Thomas Andrews knew of, or participated in, that fraud.

The prosecution of these inquiries, demands a critical and searching examination of the various facts and circumstances disclosed by the pleadings and proofs, in order that the motives and influences which led to the sale may be fully seen and understood.

1. It appears that one James Vance and Joseph Andrews, were engaged as partners in the business of merchandising; that Vance was the active partner, and had, from want of skill, or from neglect, or other cause, so managed the affairs of the partnership, that, by the spring of 1839, the concern had become greatly embarrassed, was harassed with lawsuits, for large sums of money, and threatened with immediate and hopeless insolvency.   Joseph Andrews, being advised of this state of things, became alarmed for the safety of his individual property, and declared to his friends, about that time, and *afterwards*, that *he* would never pay any of the debts of the partnership; that he had been swindled and ruined by Vance, and that none of his individual means should ever be applied to the payment of their joint debts. These facts and declarations are fully proven by C. F. and M.

B. Hamer, two of the defendant's own witnesses. In consummation of the purposes, thus avowed by Joseph Andrews, I find him, in quick succession, conveying away all, or nearly all, of his visible and tangible property, and divesting himself of everything upon which an execution at law could be made to act. How well he accomplished his design, is fully shown by the fact, that executions upon all judgments, subsequently obtained against him, were returned "no property found."

2. There is something in the very terms and character of the sale to Thomas Andrews, which, when viewed in connection with the heavy embarrassments of the firm of Andrews & Vance, and the declaration of Joseph Andrews, that he would never pay any of their debts, furnishes to my mind the most convincing proof of the true character of the transaction. 1. It is proven, that Thomas Andrews was a mechanic, with but a small property, and limited resources, and yet, by the sale, he contracted a debt for upwards of sixty-five thousand dollars; an amount vastly beyond what he could pay, by the aid of his limited means; but still we find Joseph Andrews entirely willing to rely upon no other security, than that of a deed of trust upon the same property which he sold to him; and this, too, although it appears that much of the property embraced by the deed is of a perishable nature, and must become extinct long before the period at which the heaviest portions of the debt are to mature. 2. Upwards of sixty thousand dollars of this debt is divided into three equal instalments, and made to mature nine, ten, and eleven years after the date of the contract, with a proviso in the deed of trust, that it should not be enforced until the last payment fell due; thus, in point of fact, extending the credit to eleven years. This extravagant credit is rendered more remarkable, when it is recollected that it was given *by one* in great need of ready means, to meet heavy impending liabilities, *and to one* whose limited resources furnished but a flimsy assurance that the debt would ever be paid. I think, that a sale upon such a credit, by one largely in debt, and whose every means were more than demanded to meet his then existing and pressing wants, is wholly irreconcilable with the conduct of an honest debtor; and can only be accounted for upon

the hypothesis, that the sale was made, in the language of the statute, "with intention to hinder, delay, and defraud creditors." From this view of the case I cannot doubt, that so far, at least, as Joseph Andrews was concerned, the sale was intended to lock his property against the legal pursuit of his creditors, and at the same time admit him to the secret enjoyment of the profits thereof. It placed it in his power to postpone his creditors for eleven years, and then to pay them, or not, at his pleasure.   3. This brings me to the second branch of the inquiry; Was Thomas Andrews privy to the alleged fraud ?   If he was not, then he stands fortified and protected by the provision of our statute, as a purchaser for valuable consideration, however fraudulent may have been the intention of his grantor.   The counsel for the defendants insist, that there is no evidence in the case, establishing any such privity. It very rarely happens, that direct evidence of fraud can be obtained, it is usually elicited from the facts and circumstances attending each case.   It is generally true, that the first effort of a man who intends to commit a fraud, is to throw a veil over the transaction, which may shield it against assault, and baffle all attempt at detection.   No man willingly furnishes the evidence of his own turpitude.   It is equally true, that the very means, which are carefully used to impress the transaction with outward fairness, not unfrequently serve to expose its inward deformity and turpitude.   The difficulty of obtaining direct evidence in such cases, has led to the rule in equity, that fraud may be *inferred*, from facts and circumstances, — such as the nature of the contract, and the relation and circumstances of the parties.   *Chesterfield* v. *Janssen,* 3 Ves. sen. 155 ; *Denton* v. *Mackenzie,* 1 Desauss. Rep. 300 ; *Gist* v. *Frazier,* 2 Littell's Rep. 118 ; *Watkins* v. *Stockett,* 6 Har. & Johns. Rep. 435.

I infer that Thomas Andrews was privy to the fraud intended by Joseph Andrews.

1. Because they were brothers, living in the same neighborhood, and sometimes together, and were likely, therefore, to be familiar with each others circumstances, and to share each others confidence.   2. Because the embarrassments of Joseph Andrews, as a member of the firm of Vance & Andrews, appear to have been

a matter of neighborhood notoriety, of which Joseph Andrews, himself, frequently spoke to others; avowing his determination never to pay, out of his property, any of their debts; and I am not at liberty to suppose that he did not make similar avowals to his brother, in whom he appears to have had the utmost confidence, or that the same facts were not known to him, that appear to have been familiar to others. 3. Because he shows in his answer, that he was aware of the heavy indebtedness of his brother Joseph; and he must have known, from the very nature of the long credit given to him on the sale, that it was the purpose of Joseph, to thus carry out his previously avowed intention of never paying the debts of the firm of Vance & Andrews; because he must have seen that Joseph was thus divesting himself of all the means which he had, by which either a voluntary or forced payment could be made. Taking all these circumstances 'together, I think they countervail the denials of the answer, and prove that the sale was made with a fraudulent intent. I have not noticed the deposition of Joseph Andrews, because I am satisfied that he is an incompetent witness. 1. Because a defendant who is charged with colluding with his co-defendant, in regard to the transaction sought to be impeached, cannot be a witness for his co-defendant, especially where he is liable for costs, as Joseph Andrews evidently is, in this case. *Whipple* v. *Lansing*, 3 Johns. Ch. Rep. 612; 2 Ves. sen. 628, 629.

2. Because Joseph Andrews is directly interested in upholding the sale; for, if it is set aside, he must lose all right upon his deed of trust, and to enforce the payment of the notes, taken as the consideration of that sale. Upon the whole, I shall declare the deed from Joseph Andrews to Thomas Andrews, so far as it relates to the land, fraudulent and void as against the complainant. And shall direct the costs of the suit to be paid by the defendants. Let a decree be prepared accordingly.